Death Opinion



 

 




 



 





IN THE COURT OF CRIMINAL APPEALS

OF TEXAS






No. AP-74,695






SHELDON AARON WARD, Appellant


v.


THE STATE OF TEXAS







Appeal of Case 0835934A of the

Criminal District Court Number One of

Tarrant County






Womack, J., delivered the opinion for a unanimous Court.



 A jury found the appellant guilty of the February 14, 2002, capital murder of Nyanuer Pal,
and it rendered a verdict on the issue of punishment that required the trial court to sentence the
appellant to death. (1) In the appeal to this Court, which a statute requires, (2) the appellant raises
thirteen points of error. He does not contest the sufficiency of the evidence. We affirm. 

I. Pretrial Issues

 In points of error four and five, the appellant claims that the warrantless seizure and
search of his luggage violated the Fourth Amendment. Specifically, the appellant objects to a
pretrial ruling that allowed the admission of photographs of the contents of his luggage, which
the officers who arrested him seized and searched without a warrant. 

 The appellant was arrested in Joshua, to which he had traveled as a passenger in a truck
owned and driven by Duane Thomas. Eight days after Ms. Pal was murdered, the appellant called
Thomas seeking his help. Thomas picked up the appellant from his Fort Worth motel room,
intending to drive him to Thomas's home in Johnson City. While en route, however, the
appellant told Thomas that he needed to leave town for an extended time because he had
kidnapped a young woman at gunpoint, driven her out to a rural area, raped her, stripped her
naked, and shot her in the head. Thomas decided to turn in the appellant to the police. Thomas
stopped at a convenience store in Joshua, told the appellant he was going inside to buy cigarettes,
and called the police.

 Joshua Police Department officers and a Johnson County Sheriff's deputy arrived at the
store shortly thereafter. The sheriff's deputy questioned the appellant, who said the only thing he
would say to them was that the Fort Worth Police Department had run a search warrant on his
residence and found a gun. The sheriff's deputy made contact with the Fort Worth Police
Department, where Detectives John McCaskill and Cheryl Johnson were investigating the
murder of Ms. Pal. Both detectives went to Joshua.

 At the convenience store, Johnson interviewed the appellant while he was seated in the
back of a police car. Meanwhile, Thomas showed McCaskill the appellant's luggage, which was
in the bed of Thomas's truck. McCaskill seized the appellant's luggage and returned to Fort
Worth. Detective Johnson returned to Fort Worth in a separate car, with the appellant in custody.

 At the Fort Worth Police headquarters, McCaskill opened the appellant's luggage and
photographed its contents. Some of those photographs were admitted into evidence at trial, over
the appellant's pretrial motion to suppress. The appellant asserts that the trial court erred in
admitting the photographs, as they were obtained through a violation of the Fourth Amendment.

 Before we address the appellant's Fourth Amendment claims, we note that the harm
analysis for the erroneous admission of evidence obtained in violation of the Fourth Amendment
is the constitutional standard set forth in Rule of Appellate Procedure 44.2(a). (3) If the record
shows that the trial court erred in admitting the photographs, this Court will reverse the
appellant's conviction or punishment unless we determine beyond a reasonable doubt that the
error did not contribute to the appellant's conviction or punishment.

 Assuming, arguendo, that the appellant's Fourth Amendment rights were violated,
reviewed as a whole, we find that any possible error in admitting the photographs of the contents
of the appellant's luggage was harmless beyond a reasonable doubt. Here, McCaskill's search of
the appellant's luggage yielded two types of evidence that were introduced at different portions
of the trial and for different purposes. First, during the guilt phase, the State introduced
photographs of a bedroll and other items suggesting that the appellant was traveling. The
appellant contends that the bedroll was used to support the State's argument that the appellant
was fleeing. Second, during the punishment phase, the State introduced photographs of sexually
oriented magazines from the appellant's luggage. The appellant alleges that these images were
unfairly prejudicial, given the allegations that he had sexually assaulted and murdered two young
women.

 We turn first to the photographs of the appellant's bedroll and other travel items. 
Reviewing the record, while these photographs may have been evidence of the appellant's intent
to flee, such intent was shown by other admissible evidence as well, namely the testimony of
McCaskill and Thomas. Additionally, the luggage itself, unopened, was probative of the same
factor and could have been validly introduced by the State. Finally, the photographs of the
appellant's travel gear could have had only a minimal effect on the jury's finding of guilt, given
the combined weight of the other evidence presented by the State: DNA evidence connecting the
appellant to Ms. Pal's body, eyewitness testimony of the appellant being seen following Ms. Pal
in her car shortly before her death, the recovered gun from the appellant's residence matching the
caliber of the bullet recovered from Ms. Pal's body, and Thomas's testimony as to the appellant's
own confession of guilt.

 Likewise, the photographs introduced at the punishment phase were of insufficient
consequence to the adjudication of punishment. It is unclear from the record for what purpose the
photographs were introduced. Nevertheless, like the photographs of the magazines, any
prejudicial effect they may have had on the jury was likely minimal, and far outweighed by the
other evidence presented during the punishment phase. For example, while the photographs may
have been sexually provocative, they were not the only sexually provocative photographs
presented during the trial. During the punishment phase, the State presented a separate
photograph of a sexual device taken from the appellant's former residence. Thus, even if it were
true that the appellant was prejudiced by sexually provocative evidence presented during his trial,
the photographs of his magazines were only one piece of sexually provocative evidence that the
jury may have considered in assessing punishment. The appellant argues that the admitted
photographs contributed to his conviction and sentence because they were "especially
provocative and unduly prejudicial given two alleged murders against female victims that
contained the capital aggravating element of aggravated sexual assault." (4) The appellant does not,
however, explain how the photographs of his magazines were any more prejudicial than any of
this other evidence. Since any possible error in admitting the evidence was harmless beyond a
reasonable doubt, we do not need to address the merits of the appellant's Fourth Amendment
claims. We overrule points of error four and five.

 In point of error six, the appellant claims that the warrantless seizure of his automobile,
which yielded evidence used against him at trial, was also in violation of his Fourth Amendment
rights. We need not address this issue, however, because the appellant has not preserved it for
review.

 The record shows that the appellant objected to the introduction of State's Exhibit 43: a
sealed plastic bag containing a paper bag of clothing and other items taken from the appellant's
car and offered during the direct examination of Officer Brad Patterson. That objection was
overruled and State's Exhibit 43 was admitted into evidence. Later, the State conducted direct
examination of its own DNA expert, who testified as to the results of tests conducted on clothing
items found in State's Exhibit 43. The State then offered individual cuttings from those same
clothing items into evidence as separate exhibits, during the following exchange:

 [Prosecutor]: Did you take, I'm going to use the word cuttings from these jeans and the
socks that are contained in State's 43?

 [Witness]: I did.

 Q: Let me show you State's 56 and 57. Tell me if you recognize those.

 A: I do.

 Q: What are those?

 A: State's Exhibit 56 is the cutting from a pair of blue jeans that I took, and State's No.
57 is the cuttings from the socks.

 [Prosecutor]: Judge, at this time the State would offer 57 and 56.

 (State's Exhibit Nos. 56 - 57 offered.)

 [Defense Counsel]: No objection, Judge.

 [The Court]: State's Exhibits 56 and 57 are admitted.

(Emphasis added). 

When an accused affirmatively asserts at trial that he has "no objection" to the admission of
complained of evidence, he waives any error in the admission of the evidence. (5) Any error that
defense counsel may have preserved in the present case by objecting to State's Exhibit 43 was
waived when defense counsel clearly stated, "No objection" to the admission of the same
evidence in State's Exhibits 56 and 57. We overrule point of error six.

 In point of error seven, the appellant complains of the search warrant used to obtain
biological evidence taken from his person. The appellant argues that the probable cause affidavit
for the warrants violated the Fourth Amendment because it omitted certain facts. McCaskill
testified at a pretrial hearing that, a few days before submitting his affidavit, he received
interoffice correspondence from another police officer, who had taken the statement of a witness
who had reported seeing a nude, black female being chased by a black male who was carrying a
handgun. She heard a gunshot shortly thereafter. This chase took place near the scene of the
murder. The appellant is not black. McCaskill acknowledged at the hearing that he chose not to
include this information in his probable cause affidavit.

 A search warrant may be issued only if it is supported by probable cause. (6) Sufficient
probable cause to issue a search warrant must be established by an affidavit setting forth
sufficient facts. (7) The United States Supreme Court has held that an affirmative misrepresentation
of a material fact that establishes probable cause, made knowingly or recklessly in a probable
cause affidavit, will render a search warrant invalid under the Fourth Amendment. (8) The Fifth
Circuit has applied the same analysis to omissions of material facts. (9) This Court has yet to state
clearly that Franks should apply to omissions as well. (10) We need not decide that issue today,
however, as the appellant has failed to meet his initial burden of proving that the omitted facts in
his case were material to the establishment of probable cause to search his person. (11)

 Franks requires that the defendant be granted a hearing to present evidence on the issue
of whether a misrepresentation was knowingly and falsely made in a probable cause affidavit and
whether it was material to the establishment of probable cause, such that any evidence derived
from that search warrant should be suppressed. (12) Martin purports to extend that same analysis to
the omission of material facts. (13) If a defendant establishes by a preponderance of the evidence
that in a probable cause affidavit, first, omissions of fact were made, and second, such omissions
were made intentionally or with a reckless disregard for the truth, the warrant will be held invalid
if the inclusion of the omitted facts would vitiate probable cause. (14) Here, even if the omission of
material facts from an affidavit were sufficient to vitiate probable cause, the appellant has not
met his burden of showing by a preponderance of the evidence that the omitted facts in this case
were material in nature. 

 McCaskill's affidavit relied on his interviews of three eyewitnesses who saw the
appellant at a bar with Ms. Pal only hours before her body was discovered. Two of the
eyewitnesses were employees of the bar who recognized the appellant as a frequent customer,
and one of them also had seen the appellant leave the bar in a truck following Ms. Pal as she left
in her car. McCaskill also had been told by the Tarrant County Medical Examiner that pubic
hairs not belonging to Ms. Pal were found in her vaginal vault, and that this suggested there had
been sexual contact between Ms. Pal and some unknown individual prior to her death. A
reasonable trier of fact could have found sufficient probable cause existed for McCaskill to
obtain biological evidence from the appellant based on these facts, and the appellant presents no
evidence to challenge any of these facts.

 Appellant points to the omitted witness statement to suggest that there was some material
evidence contradictory to the appellant's being with the victim near the time of her death. The
witness reported seeing the nude female being chased on "Tuesday February 12 or on Wednesday
[the] 13, 2002 at about 20:30 hours." All three eyewitnesses in McCaskill's affidavit, on the
other hand, reported seeing Ms. Pal in the company of the appellant at a bar on the night of
February 13, 2002, and continuing until the bar closed at 2:00 a.m. on February 14, 2002. Her
body was found at approximately 10:00 a.m. on February 14. The appellant has failed to show by
a preponderance of the evidence that the omitted facts were material to the establishment of
probable cause to obtain evidence from his person. Thus, the trial court was within its discretion
to overrule the appellant's motion to suppress. As with any motion to suppress evidence, great
deference is owed to the trial court as the sole fact-finder and judge of the witness's credibility. (15)
This Court is not at liberty to disturb any finding supported by the record. (16) We overrule point of
error seven.

II. Punishment Phase Issues

 In point of error one, the appellant contends that the trial court abused its discretion by
admitting evidence at the punishment phase of the extraneous offense of the murder of Rachel
Urnosky, because the State failed to sufficiently prove the appellant was linked to the offense.
The record shows that, during the punishment phase of the trial, the appellant waited until the
State had rested its punishment case-in-chief before moving to strike the testimony of all nine
witnesses whom the State had called to testify on the issue of the appellant's alleged involvement
in Urnosky's murder. The appellant argued that, because the State had failed to establish a
sufficient nexus between the appellant and the extraneous offense, all testimony regarding the
extraneous offense should be struck from the record on relevancy grounds. The appellant did not
object to any part of the nine witnesses' testimony as it was being presented.

 For appellate review in criminal cases, an error in admitting evidence must be preserved
by a proper objection and a ruling on that objection. (17) The objection must be timely; that is, the
defense must have objected to the evidence, if possible, before it was actually admitted. (18) If this
was not possible, the defense must have objected as soon as the objectionable nature of the
evidence became apparent and must have moved to strike the evidence, that is, to have it
removed from the body of evidence the jury is allowed to consider. (19)

 In this case, the record shows that the appellant made no objection to any of the
complained-of evidence as it was presented through the testimony of nine separate witnesses.
Rather, he waited until the State had rested its punishment case-in-chief before moving to strike
the testimony of all nine witnesses at once on the grounds that their combined testimony had
failed to sufficiently connect Ward to Urnosky's death and was therefore entirely irrelevant. (20)
The appellant directs us to Fuller v. State (21) to support his argument that, because there was no
way he could have realized the irrelevance of the State's evidence until hearing it, he could
validly make a "summary" motion to strike at the end of the State's case.

 The appellant's reliance on Fuller is misplaced. In Fuller, the appellant argued that the
trial court had erred in admitting evidence of his alleged membership in the Aryan Brotherhood
gang during the punishment phase of his trial. (22) The trial court had allowed the State to develop
its argument under the "conditional relevance procedure" in which the State would bear the
burden of later proving the relevance of its evidence against a motion to strike. (23) Although this
Court agreed that the evidence presented by the State was "woefully insufficient" to connect the
appellant to membership in the Aryan brotherhood, we nevertheless refused to exclude the
testimony because, after all the objectionable evidence had been presented, the defense failed to
reurge its relevancy complaint, move to strike the evidence, and ask for a jury instruction to
disregard. (24) As opposed to the case at hand, where the appellant made no objection at all until the
motion to strike, the appellant in Fuller made repeated objections to the evidence as it was
presented. The only question in that case was whether the numerous trial objections constituted,
in the aggregate, a valid motion to strike. Reluctantly, this Court held that they did not. (25) The
appellant in the present case misstates Fuller as standing for the premise that he could wait and
object to the relevance of all such evidence with one summary motion to strike. Fuller provides
no such exception to the contemporaneous objection rule. We overrule point of error one.

 In points of error two and three, the appellant contends that the trial court erred in ruling
that he would be compelled to undergo state-sponsored psychiatric examination if he presented
mental health expert testimony on the mitigation special issue at the punishment phase.
Specifically, the appellant attempted to present the testimony of Robin Neely, a social worker
who was to testify as to her opinion of the appellant's dysfunctional family background, based on
her independent review of a social history and psychiatric evaluation of the appellant conducted
by others. The State objected to the appellant's offer of Neely's expert opinion until the State had
an opportunity to have its own psychiatric expert evaluate the appellant. The trial court sustained
the objection and the appellant, rather than submit to examination by the State's expert, chose not
to present Neely's testimony.

 In point two, appellant argues that it was error for the trial court to exclude this expert
since his testimony was limited to the mitigation special issue. In Lagrone v. State, (26) this Court
held that a trial court may order a criminal defendant to submit to a state-sponsored psychiatric
exam on future dangerousness when the defense introduces, or plans to introduce, its own future
dangerousness expert testimony. (27) The principle behind the holding is that, while the defendant
does not actually waive his Fifth Amendment rights until he presents such testimony, the unique
circumstances of the situation necessitate a "legal fiction" in which a limited waiver of the
defendant's Fifth Amendment rights is inferred by the indication of his intent to present such
testimony. (28) The appellant here argues that Lagrone applies only to cases in which the defendant
attempts to present testimony on the specific issue of future dangerousness, and not to cases such
as his, in which the expert will testify as to mitigating factors. 

 We are not persuaded that Lagrone is so limited. In Chamberlain v. State, (29) the defendant
likewise argued at trial that he should be allowed to present the testimony of a psychiatric expert
who had examined him, without being forced to submit to examination by the State's own
psychiatric expert. The defendant in Chamberlain attempted to distinguish his own case from
Lagrone by noting that his expert would testify only in rebuttal to the testimony of the State's
expert witness, and not to introduce his own psychiatric evidence. This Court rejected such a
distinction:

 The holdings of Soria and Lagrone are governed by the principle that
if a defendant breaks his silence to speak to his own psychiatric
expert and introduces that testimony which is based on such
interview, he has constructively taken the stand and waived his fifth
amendment right to refuse to submit to the state's psychiatric experts.
The focus is the defendant's choice to break his silence. The issue is
not whether appellant introduced psychiatric evidence or merely
rebutted such evidence. The issue is whether the psychiatric
testimony he intended to introduce was based on his own
participation in the psychiatric testing and examination. Appellant
intended to introduce psychiatric testimony based upon his
participation in a psychiatric examination. This "constituted a waiver
of the defendant's fifth amendment privilege in the same manner as
would the defendant's election to testify at trial." Soria v. State, 933
S.W.2d 46, 54 (Tex. Cr. App. 1997). Appellant cannot claim a fifth
amendment privilege in refusing to submit to the State's psychiatric
examinations and then introduce evidence gained through his
participation in his own psychiatric examination. The essential
principles at work in Lagrone and Soria are waiver and parity; if a
defendant testifies, even in mere rebuttal, the State may be allowed to
cross-examine him. (30) 


 As Chamberlain makes clear, principles of fairness allow a trial court to compel a 


defendant to submit to examination by the State's psychiatric expert as a condition of allowing
that defendant to present psychiatric testimony by his own expert. As stated in Lagrone, "Our
sense of justice will not tolerate allowing criminal defendants to testify through the defense
expert and then use the Fifth Amendment privilege against self-incrimination to shield
themselves from cross-examination on the issues which they have put in dispute." (31) If a
defendant wishes to present expert psychiatric testimony, then the State is entitled to have its
own psychiatric expert examine the defendant as a precondition to allowing that testimony. The
nature of the psychiatric testimony to be presented is immaterial-that it is being presented by the
defendant is enough to trigger the rule. We overrule point of error two. 

 In point of error three, the appellant also argues that the trial court's ruling violated his
constitutional right to present a defense under the Sixth Amendment. (32) A defendant's right to
present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. (33) State
and federal rulemakers have broad latitude under the Constitution to establish rules excluding
evidence from criminal trials. (34) Such rules do not abridge an accused's right to present a defense
so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to
serve." (35) We have found the exclusion of evidence to be unconstitutionally arbitrary or
disproportionate only where it has infringed upon a weighty interest of the accused. (36) 

 Here, the trial court applied the holding of Lagrone that defendants who present expert
testimony as to their mental health status may be compelled to undergo examination by the
State's mental health expert under a theory of limited Fifth Amendment waiver. The appellant
does not point us to any authority showing this rule to be arbitrary or disproportionate to its
purposes of waiver and parity, nor does anything in the record support such an assertion.
Moreover, even if the trial court committed error in imposing this condition upon the appellant,
we have held that such error does not become a constitutional violation unless: (1) the
evidentiary rule categorically and arbitrarily prohibits the defendant from offering relevant
evidence that is vital to his defense, or (2) the trial court erroneously excludes relevant evidence
that is a vital portion of the case, effectively precluding the defendant from presenting a
defense. (37) 

 The appellant was allowed to present evidence of his family background as relevant to the
mitigation special issue through the testimony of three witnesses. His mother, Stephanie Slifer,
testified that during his childhood, the appellant experienced her divorce from his father, his
stepfather's drug use (as well as her own), and the pernicious influence of her sister Charlene,
with whom the appellant briefly resided as a teenager. His aunt, Brenda Knauer, corroborated her
sister Stephanie's testimony as to drug use in the home and the negative influence of the
appellant's aunt (and her own sister) Charlene. His childhood friend, Kyle Kraft, also testified as
to the negative influence of the appellant's time living with his Aunt Charlene, and that he and
the appellant had used illegal drugs as teenagers. Taken as a whole, this was ample evidence of
the appellant's troubled childhood for the jury to consider in assessing punishment. Thus, it
cannot be said that the trial court's ruling on Neely's testimony effectively deprived appellant of
the opportunity to present any evidence on the issue of mitigation, or to present a defense
generally. We overrule point of error three. 

 In point of error eight, the appellant contends that it was an abuse of discretion for the
trial court to admit testimony by the State's psychiatric expert on future dangerousness. The
appellant argues that the testimony of the State's witness on the issue of future dangerousness,
Dr. David Self, should have been struck because the State failed to show that it would aid the
jury in any appreciable way. (38) 

 The appellant's argument is without merit. Dr. Self's testimony related directly to the
appellant's tendency towards violent, predatory acts, based upon the offense report of this case as
well as interviews he conducted with people who know the appellant. That Dr. Self did not
interview the appellant did not make his testimony inadmissible. It is settled in this State that
psychiatric expert opinion testimony of a defendant's future dangerousness may be based solely
upon hypothetical questions, without the benefit of an examination of the defendant. (39) The trial
court was within its discretion to admit Dr. Self's testimony on this issue. We overrule point of
error eight.

III. Constitutional Arguments

 In point of error nine, the appellant argues that the Texas death penalty statute violates the
prohibition against cruel and unusual punishment found in the Eighth Amendment to the United
States Constitution because it allows the jury too much discretion to decide who lives or dies,
without the minimal standards and guidance necessary to avoid arbitrary and capricious
imposition of the death penalty upon defendants like himself. He argues that the definition of
"mitigating circumstances" under the Texas statute is ambiguous, thus allowing juries to
sentence defendants to death under no consistent standards. (40) We have previously considered and
rejected identical arguments. (41) The appellant makes no new arguments specifically relating to his
case. We overrule point of error nine.

 In point of error ten, the appellant argues that the Texas death penalty statute violates the
Eighth Amendment because instructions on the mitigation special issue send "mixed signals" to
the jury thereby rendering any verdict reached in response to that special issue intolerably
unreliable. (42) This Court has previously addressed and rejected this claim. (43) We overrule point of
error ten.

 In point of error eleven, the appellant argues that the Texas death penalty statute violates
the Due Process Clause of the Fourteenth Amendment to the United States Constitution because
it improperly places the burden of proof for the mitigation special issue on the appellant rather
than requiring the State to prove to the jury that there were no mitigating factors beyond a
reasonable doubt. (44) This Court considered and rejected this exact argument in Jones. (45) We held
there that Apprendi is inapplicable to Article 37.071 because the Texas statute does not allow for
any enhancements beyond the statutory maximum penalty of death. Rather, under the Texas
statute, a jury finding on the special issue of mitigation can serve only to reduce the statutory
sentence to life imprisonment. Thus, no Apprendi issue is present. (46) We overrule point of error
eleven.

 In point of error twelve, the appellant argues that the Texas death penalty statute violates
both the Eighth Amendment and the Due Process Clause of the Fifth Amendment to the United
States Constitution because it leads to the execution of an unacceptable number of innocent
defendants. Additionally, in point of error thirteen, the appellant argues that the Cruel and
Unusual Punishments Clause of the Eighth Amendment and the Due Process Clause of the Fifth
Amendment compel the courts to determine and redetermine the constitutionality of the death
penalty according to "evolving standards of decency and current knowledge about its operation." 
The appellant does not, however, make any argument claiming his own innocence in this case,
and therefore fails to show how his own rights under the Due Process Clause could have been
violated by the application of our death penalty statute. (47) We overrule points of error twelve and
thirteen.

 The judgment of the trial court is affirmed.

Delivered: May 23, 2007

Do Not Publish.




 
1. See Code Crim. Proc. art. 37.071, § 2(b), (e), (g).
2. Id., § 2(h).
3. Hernandez v. State, 60 S.W.3d 106, 108 (Tex. Cr. App. 2001); R. App. Proc. 44.2(a).
4. Appellant's brief, at 40.
5. Jones v. State, 833 S.W.2d 118, 126 (Tex. Cr. App. 1992); Dean v. State, 749 S.W.2d 80, 83 (Tex. Cr. App.
1988). 
6. U.S. Const. amend. IV; Tex. Const. Art. I, § 9; Code Crim. Proc. art. 18.01(b); Hughes v. State, 843
S.W.2d 591, 593 (Tex. Cr. App. 1992).
7. Code Crim. Proc. art. 18.01(c).
8. Franks v. Delaware, 438 U.S. 154, 155-56 (1978). 
9. United States v. Martin, 615 F.2d 318, 328 (Fifth Cir. 1980). 
10. Massey v. State, 933 S.W.2d 141, 146 (Tex. Cr. App. 1996). 
11. See id. at 146-47.
12. Franks, 438 U.S. at 156.
13. Martin, 615 F. 2d at 328.
14. Ibid.
15. Janecka v. State, 937 S.W.2d 456, 462 (Tex. Cr. App. 1996); Fierro v. State, 706 S.W.2d 310, 316 (Tex. Cr.
App. 1986).
16. Flores v. State, 871 S.W.2d 714, 721 (Tex. Cr. App. 1993).
17. R. App. Proc. 33.1(a); Moff v. State, 131 S.W.3d 485, 489 (Tex. Cr. App. 2004); Valle v. State, 109 S.W.3d
500, 509 (Tex. Cr. App. 2003); Ethington v. State, 819 S.W.2d 854, 858 (Tex. Cr. App. 1991). 
18. Ethington, 819 S.W.2d, at 858.
19. Id.
20. Kemp v. State, 846 S.W.2d 289, 307 (Tex. Cr. App. 1992); Code Crim Proc. art. 37.071, § 2(a).
21. 829 S.W.2d 191 (Tex. Cr. App. 1992).
22. Id. at 195-96.
23. Id. at 197; R. Crim. Evid. 104(b).
24. Id. at 198-99.
25. Ibid.
26. 942 S.W.2d 602 (Tex. Cr. App. 1997).
27. Id. at 611 (emphasis omitted).
28. Ibid
29. 998 S.W.2d 230 (Tex. Cr. App. 1999).
30. Id. at 234 (emphasis added).
31. Lagrone, 942 S.W.2d, at 611.
32. Washington v. Texas, 388 U.S. 14 (1967); Miller v. State, 36 S.W.3d 503, 506 (Tex Cr. App 2001).
33. Potier v. State, 68 S.W.3d 657, 659 (Tex. Cr. App. 2002) (citing United States v. Scheffer, 523 U.S. 303, 308
(1998)).
34. Ibid..
35. Ibid.
36. Id. at 659-60.
37. Ray v. State, 178 S.W.3d 833, 835 (Tex. Cr. App. 2005); Valle v. State, 109 S.W.3d 500, 506 (Tex. Cr. App.
2003); Potier, 68 S.W.3d, at 659-62. 
38. R. Evid. 702.
39. Cook v. State, 858 S.W.2d 467, 475 (Tex. Cr. App. 1993); Pyles v. State, 755 S.W.2d 98, 118 (Tex. Cr. App.
1988).
40. Code Crim. Proc. art. 37.071 § 2(e)(1).
41. See Moore v. State, 999 S.W.2d 385, 408 (Tex. Cr. App. 1999); Poindexter v. State, 942 S.W.2d 577, 587
(Tex. Cr. App. 1996).
42. See Penry v. Johnson, 532 U.S. 782 (2001).
43. Scheanette v. State, 144 S.W.3d 503, 506 (Tex. Cr. App. 2004); Jones v. State, 119 S.W.3d 766, 790 (Tex.
Cr. App. 2003).
44. See Apprendi v New Jersey, 530 U.S. 466 (2000).
45. Jones, 119 S.W.3d, at 791.
46. Ibid.
47. Paredes v. State, 129 S.W. 3d 530, 541 (Tex. Cr. App. 2004).