**Earl WASHINGTON, Plaintiff,**

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

Civ. A. No. 87–1639.

United States District Court, District of Columbia.

April 26, 1988.

Gary M. Sidell, Washington, D.C., for plaintiff.

Frederick D. Cooke, Jr., Corp. Counsel, District of Columbia, Martin L. Grossman, Deputy Corp. Counsel, District of Columbia, Civil Div., Roberta L. Gross, Asst. Corp. Counsel, Chief, General Litigation Section I, for defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This case comes before the court, after the parties have completed extensive discovery and fully briefed several issues, on defendants' motion to dismiss or in the alternative for summary judgment.[1]

This civil lawsuit arises out of a criminal investigation of the plaintiff, Earl Washington, Walter Anthony Paige ("Lucky") and the premises of the Quincy Market. That investigation culminated in the execution of a search warrant for the Market on June 17, 1986. At the conclusion of their search, the police officers determined they had probable cause to arrest plaintiff Washington; they placed him under arrest and charged him with running an illegal gambling operation. The criminal charges against plaintiff were dropped soon thereafter.

In his nine count complaint, the plaintiff raises two principal claims. First, he charges the defendant police officers with wrongfully withholding material information from the Superior Court Judge from whom they obtained the search warrant to search his store; and second, he contends that he was searched and arrested without probable cause for possession of numbers slips and maintaining a gambling premises. Plaintiff has alleged federal claims against the defendant officers in the form of search and arrest without probable cause pursuant to 42 U.S.C. § 1983.[2] He sues the individual defendants in both their individual and their official capacities. He also has lodged common law false arrest, false imprisonment, malicious prosecution and negligence claims against the individual police officers. He also sues the District of Columbia directly under section 1983 for its allegedly negligent supervision of the individual defendants and vicariously under a common law theory of respondeat superior for the actions of the police officers. Plaintiff seeks compensatory money damages of $500,000 and punitive damages of $1,000,-000.

The individual defendants have moved to dismiss the section 1983 claims on the basis of their qualified immunity. They also argue that the common law claims should be dismissed because probable cause existed to support the search and arrest. In turn, defendant District of Columbia contends that the existence of probable cause to search the Market and arrest the plaintiff precludes its liability for the common law claims.

### The Facts

Because this case comes before the court on defendants' motion for summary judgment, I have decided this case based on the facts that I find not in dispute and the reasonable inferences to be drawn from them. See F.R.Civ.P. 56. See also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (plaintiff's burden when confronted

---

1. Since this issue comes before me at the completion of discovery, I will treat defendants' motion as one for summary judgment, pursuant to Federal Rule of Civil Procedure 56(b), rather than as one for dismissal, pursuant to Federal Rule of Civil Procedure 12(b)(6).

2. Violations of fourth and fifth amendment rights may be redressed under 42 U.S.C. § 1983. *See generally Monroe v. Pape*, 365 U.S. 167, 171, 81 S.Ct. 473, 475–76, 5 L.Ed.2d 492 (1961).

with a summary judgment motion is to "set forth specific facts showing that there is a genuine issue for trial"); *Martin v. D.C. Metropolitan Police Dept.*, 812 F.2d 1425, 1434 (D.C.Cir.1987) (when evaluating a motion for summary judgment, particularly one based on a claim of qualified immunity, a district court must keep in mind that "it is not the moving party's burden to disprove unsupported claims of his opponent") (citing *Liberty Lobby*).[3]

At the time their investigation of Quincy Market began, Detectives Roy V. Brannan and Beverly Randall, the investigating officers in this case, had been members of the Metropolitan Police Department for approximately twenty years combined. They were assigned to the Gambling Branch of the Morals Division and had received extensive formal and on the job training in the basics of conducting investigations concerning illegal gambling activities.

Their investigation was touched off in May, 1986, when Detective Brannan received information from a reliable Confidential Source, who "in the past [ ] supplied information resulting in the execution of arrest and search warrants for gambling related offenses which further resulted in the seizure of gambling paraphernalia and the arrest and conviction of numerous offenders."[4] The Confidential Source informed Detective Brannan that an illegal lottery was being conducted at the Quincy Market, 114 Quincy Place. The Confidential Source also provided the license plate numbers for two cars that belonged to individuals who were involved in the illegal gambling operation. Those cars belonged to Mr. Walter Anthony Paige ("Lucky") and plaintiff Earl Washington, respectively. Detectives Brannan and Randall determined that the owner of the Market was Washington.

The Detectives first took action during the week of May 19, 1986, when Brannan met with the Confidential Source and provided him with advanced confidential funds. Brannan observed the Confidential Source enter and depart from the Quincy Market. The Confidential Source later relayed to Brannan that he had placed a bet with Washington in the Market. The Confidential Source also told Brannan that Washington dropped the numbers bets and monies inside a box located near the freezer. According to the Confidential Source, Paige would pick up the bets later and take them to Maryland. On May 21, the Confidential Source told Brannan that Washington had told him that he only took bets on the Maryland numbers, and not the illegal street number.

Randall and Brannan thereafter observed "Lucky" make several trips between his home, located down the block at 104 Quincy Street, and the Quincy Market during prime gambling hours. The Detectives observed Paige constantly trooping back and forth between the two locations, but consistently staying inside the Market for only short periods of time.

On several occasions during the next three weeks, the Confidential Source reported to Detectives Brannan and Randall that he had placed bets at the Market. In addition, the Detectives again provided the Confidential Source with advanced funds and watched him enter and exit the Market. He later confirmed that he had placed an illegal bet with Washington.

Sometime in the course of their initial background investigation of the Quincy Market, Detective Brannan contacted De-

---

**3.** *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2555 (1986) ("[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.' ") (quoting Fed.R.Civ.P. 1). These considerations have "added force when, as in the area of concern in this case, the reasons for swiftly terminating insubstantial lawsuits are particularly strong."

*Martin v. Malhoyt,* 830 F.2d 237, 253 (D.C.Cir. 1987). *See also Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396.

**4.** Affidavit in Support of District Columbia Superior Court Search Warrant for the Location and Person Described Below for Violations of the Gambling Laws of the District of Columbia ("Affidavit for Search Warrant") at 1.

tective John Betts to determine whether a 1979 arrest for possession of illegal gambling slips that Betts made in front of the Market involved the so-called numbers business they now suspected was being carried out in the Quincy Market. Detective Betts told Brannan that the 1979 arrest was not in any way related to the alleged contemporary numbers business. In addition, plaintiff contends, Betts volunteered to Brannan his view that no illegal activities were ongoing at the Quincy Market at that time and that he thought plaintiff Washington was a fine and upstanding member of the community.[5] Detective Betts, at the time he spoke with Brannan, was neither assigned to the Gambling and Morals Division nor engaged in any official investigation of the activities of the Quincy Market. According to Betts and Washington, however, Betts paid fairly frequent visits to the Market—in the range of three or four visits per month. Detective Brannan did not find the information provided by Betts to be contrary to or inconsistent with the information obtained from the Confidential Source and his and Detective Randall's personal observations of the Market.

Based on these events, Detectives Brannan and Randall concluded that they had probable cause to believe that an illegal gambling operation was being conducted inside the Quincy Market. They completed an affidavit for a warrant to search the Market and the person of Paige. The affidavit outlined the detectives' personal observations and the information they had obtained from the Confidential Source. It did not include a report of the conversation with Betts. The affidavit was reviewed by Assistant United States Attorney David Cisen, and submitted to District of Columbia Superior Court Judge Paul Webber. Judge Webber found probable cause and approved the search warrant on June 11, 1986.

The search warrant was executed on June 17, 1986, at approximately Noon. After informing plaintiff Washington of the purpose of their visit, the defendant officers, along with several other police officers, sealed the Market and searched it for gambling paraphernalia. The search lasted approximately an hour. The officers found a registered handgun, a green ledger book which contained notations about a lottery, a listing of past D.C. and Maryland winning legal lottery numbers, and a listing of past illegal lottery numbers.[6] The officers either asked or ordered Washington to empty out the contents of his pockets. Among the contents were lottery tickets or slips—it is contested whether they were legal or

---

**5.** Although Brannan confirms that Betts told him the 1979 arrest was unconnected with the Quincy Market and the ongoing criminal investigation, he does not recall Betts providing him with any additional information.

**6.** *See generally* Defendants' Pretrial Statement at 7. Plaintiff does not take issue with this general description of what was found by the search. Both parties agree that there was a "green ledger book" found in the store with lottery notations. They also agree that lottery-related slips were found on Washington's person. In addition, plaintiff concedes that the search uncovered a "computer print out of the Maryland lottery numbers that have played in the past" in the Market—even though the Market was not located in Maryland and did not have, and indeed, could not have had, a legal Maryland lottery machine on the premises. *See* Answers and Objections of Plaintiff, Earl F. Washington, to Interrogatories and Request For Production of Documents at 14–15 (Answer 30).

Rather, plaintiff takes issue with the possible inferences that can reasonably be drawn from those items that were uncovered. He contends that these items—once properly understood to be what they really were—are innocuous and cannot form the basis for probable cause to arrest a suspect. According to plaintiff, the officers jumped too quickly to conclusions based on the superficial appearance of these items.

In particular, plaintiff contends that the green ledger book, which the officers believed was an illegal "numbers book" was in fact merely a credit book typically used by small grocery stores and that the "lottery notations" in that book were easily explained as debts owed to Washington by a patron for whom he purchased legal Maryland lottery tickets. He also claims that the "numbers slips" withdrawn from Washington's pocket were in fact legal Maryland lottery tickets and other non-incriminating slips of paper. And he implies that a list of the Maryland lottery numbers that have been past winners is not—at least standing alone—inculpatory evidence.

illegal.[7]

The officers arrested Washington for the felony crime of operating an illegal lottery [8] and the misdemeanor crime of possession of illegal lottery tickets.[9] They handcuffed Washington and escorted him to the police station.[10] The next day the United States Attorney's Office charged Washington with two misdemeanors—illegal possession of numbers slips and maintaining a gambling premises. On July 9, 1986, the criminal prosecution of Washington was dismissed by the United States Attorney's Office.

*Analysis*

I. The Section 1983 Claims

Plaintiff's section 1983 claims are predicated on three separate contentions: 1)

7. According to plaintiff, "After I was searched by the police, they removed several scraps of paper from my wallet on which I had written my choices for the Maryland Lotto game that day ..." Affidavit of Earl Washington, January 6, 1988, at 3. Plaintiff contends that he told the officers that these papers "were my lottery numbers for Maryland" and that each of the numbers on the slips of paper had some personal significance—such as a relative's birthday or address. *See* Washington Affidavit, *supra,* at 3; Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Motion of Defendants to Dismiss or, in the Alternative, for Summary Judgment ("Plaintiff's Opposition") at 4.

8. *See* D.C.Code 1981 § 22–1501, which provides:
   If any person shall within the District keep, set up, or promote, or be concerned as owner, agent, or clerk, or in any other manner, in managing, carrying on, promoting or advertising, directly or indirectly, any policy lottery, policy shop, or any lottery, or shall sell or transfer any chance, right, or interest, tangible or intangible, in any policy lottery, or any lottery or shall sell or transfer any ticket, certificate, bill, token, or other device, purporting or intended to guarantee or assure any person or entitle him to a chance of drawing or obtaining a prize to be drawn in any lottery, or in a game or device commonly known as a policy lottery or policy or shall, for himself or another person, sell or transfer, or have in his possession for the purpose of sale or transfer, a chance or ticket in or share of a ticket in any lottery or any such bill, certificate, token, or other device, he shall be fined upon conviction of each said offense not more than $1,000 or be imprisoned not more than 3 years, or both. *The possession of any copy or record of any such chance, right or*

plaintiff asserts that the defendant police officers lacked probable cause to obtain a search warrant and to search the Quincy Market; 2) he contends the defendant police officers were without probable cause to search and arrest him; and 3) he claims defendant District of Columbia's negligent supervision of the individual defendants establishes the District's legal responsibility for both his purportedly false arrest and the alleged physical injuries he sustained from being handcuffed.

A. *The Search Warrant*

Plaintiff concedes that the affidavit for the search warrant and the search warrant itself satisfy, on their face, the fourth amendment standard of probable cause.[11]

*interest, or of any such ticket, certificate, bill, token, or other device shall be prima facie evidence that the possessor of such copy or record did, at the time and place of such possession, keep, set up, or promote, or was at such time and place concerned as owner, agent or clerk, or otherwise in managing, carrying on, promoting, or advertising a policy lottery, policy shop, or lottery.*
(emphasis added).

9. *See* D.C.Code 1981 § 22–1502, which provides:
   If any person shall, within the District of Columbia, knowingly have in his possession or under his control, any record, notation, receipt, ticket, certificate, bill, slip, token, paper, or writing, current or not current, used or to be used in violating the provisions. of §§ 22–1501, 22–1504, or 22–1508, he shall, upon conviction of each such offense, be fined not more than $1,000 or be imprisoned for not more than 1 year, or both. *For the purpose of this section, possession of any record, notation, receipt, ticket, certificate, bill, slip, token, paper, or writing shall be presumed to be knowing possession thereof.*
   (emphasis added).

10. Plaintiff contends that defendant Smith "improperly handcuffed plaintiff producing immediate pain and ultimately neurological damage to plaintiff's right wrist." Plaintiff's Opposition at 4.

11. There is no question that the search warrant affidavit, considered in its entirety, satisfied the probable cause standard of *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (abandoning "two-pronged test" of *Aguilar* and *Spinelli* and adopting totality of the circumstances analysis for probable cause determinations). The totality of the circumstances, in-

Nevertheless, based on a subfacial challenge to the affidavit, plaintiff claims that defendants lacked probable cause to search the Quincy Market when they applied for a search warrant. Plaintiff further contends that the defendants' application for a search warrant was unreasonable and fell short of the standard for asserting qualified immunity established in *Anderson v. Creighton,* — U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Plaintiff's challenge is predicated on two separate bases. First, plaintiff argues that it was objectively unreasonable for defendants to exclude the information provided by Detective Betts from the affidavit submitted to the Superior Court Judge. Plaintiff claims that the inclusion of this information in the warrant would have negated probable cause. Second, plaintiff contests both the existence and the reliability of defendants' "alleged paid informant." [12] Defendants argue that these contentions would be insufficient to entitle plaintiff to suppress the evidence found in the Market if this issue came before a court in a criminal posture—and that they are more seriously inadequate as a basis for piercing defendants' qualified immunity in this civil proceeding. Because I conclude that the defendant officers had probable cause to search the Market, and that the search warrant was validly issued, I do not reach the qualified immunity defense in this context.

### 1. The Betts Conversation

In the leading Supreme Court case involving alleged material misrepresentations in a search warrant affidavit, the Court held that:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or

with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

▪ This standard for misstatements of fact has been extended by numerous courts to cover allegations of material omissions. *See e.g. United States v. Williams,* 737 F.2d 594, 604 (7th Cir.1984) (collecting cases) ("rationale of *Franks* applies to omissions"); *United States v. Martin,* 615 F.2d 318, 328 (5th Cir.1980) ("allegations of material omissions [are] to be treated essentially similarly to claims of material misstatements"); *Ogden v. District of Columbia,* 676 F.Supp. 324 (D.D.C.1987) (accord). Of course, these courts recognize that the omitted fact(s) must be material—that is, in order to invalidate the affidavit, the inclusion of the omitted fact(s) must undermine probable cause. *See Williams,* 737 F.2d at 604.

The *Franks* Court established a rigorous standard for objectants to meet merely to obtain a *"Franks"* suppression hearing. The Court, emphasizing that there is "a presumption of validity with respect to the affidavit supporting the search warrant," asserted that:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof ... Affidavits or sworn or otherwise reliable

cluding the defendant officers' personal observations of the Market and the reliable information supplied by the informant, provided a "substantial basis" for Judge Webber to conclude that probable cause existed that illegal gambling was taking place in the Market. *Id.* In fact, the affidavit also satisfied the more rigorous two-pronged test of *Aguilar–Spinelli. See generally Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723

(1964). The informant reported incriminating facts based on personal knowledge and in sufficient detail to insure that there was a strong basis for his allegations. *Id.* His past performance as an informant, and his willingness to involve himself with the criminal investigation established both his credibility and his veracity. *Id.*

**12.** Plaintiff's Motion for Reconsideration and Memorandum of Points and Authorities at 1.

statements of witnesses should be furnished, or their absence satisfactorily explained ... Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

438 U.S. at 171–72, 98 S.Ct. at 2684.[13]

■ In this case, plaintiff satisfies neither prong of the *Franks* standard for obtaining a suppression hearing. Inclusion of Detective Betts' statements in the affidavit would not have vitiated probable cause. They are therefore not "material" under *Franks*. Even assuming that the omitted factual statements by Betts are true—namely that the Quincy Market was not involved in a 1979 criminal investigation that took place in the vicinity of the Market and that Detective Betts was correct in his view that the Market and Washington were "clean" in 1986—their inclusion in the affidavit would have done little to shake the sufficiency of the affidavit to establish probable cause. That is the case both because of the strength of the remainder of the affidavit and the probative weakness of Betts' views.

The evidence marshalled by defendants in their affidavit is detailed and powerful. They attest in the affidavit that their Confidential Source is reliable—the Confidential Source can be trusted because he has supplied information in the past that has led to gambling arrests and convictions. Furthermore, the officers attested that on several occasions they observed the Confidential Source place bets at the Quincy Market. In addition, the defendants recorded in the affidavit detailed incriminating information provided by the Confidential Source—in particular that Washington placed monies and numbers bets inside a box located near the freezer. Perhaps most importantly, the officers attested in the affidavit that they observed highly suspicious behavior—in particular the actions of Paige—at the Market on several occasions.

In contrast to this fact specific information, drawn from personal observations and a reliable source, the statements made by Betts were conclusory and based on personal opinion. The fact that the Market was not involved in a 1979 criminal investigation in which Detective Betts participated is not exculpatory in any meaningful sense. *See generally United States v. Benevento*, 649 F.Supp. 1379, 1384 (S.D.N.Y. 1986) (Weinfeld, J.) ("[w]hile omission of exculpatory evidence might well be material, an absence of incriminating evidence is not exculpatory ...").[14] Betts also gave defendants his personal opinion that in May, 1986, "no illegal gambling was going on at the Quincy Market."[15] Such information, volunteered by a police officer who

---

**13.** *See also United States v. House*, 604 F.2d 1135, 1139, n. 5 (1979) (standard to merit a *Franks* hearing is demanding).

In order to *prevail* at a *Franks* hearing, an objectant must show by a preponderance of the evidence that the affidavit contained false statements or made material omissions that were material to the finding of probable cause. *Id; United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir.1985). The statement that is allegedly false or the material omission must be shown to have been made intentionally or with a reckless disregard for the accuracy of the affidavit. *See generally Franks; Ferguson*, 758 F.2d at 848; *United States v. Martin*, 615 F.2d 318, 328 (5th Cir.1980). *United States v. Johnson*, 696 F.2d 115, 118, n. 21 (D.C.Cir.1982) (accord).

**14.** Of course, had Betts provided information to defendants that suggested the Market, Washington, or Paige were involved in the 1979 criminal activity—which involved gambling operations and possession of numbers slips at a free standing pay telephone located outside the Market—that information could have served as a lead in the ongoing 1986 investigation. Such information may very well have led to less dated information that would have been of sufficient probative value to be included in the affidavit.

Contrary to plaintiff's contention, however, the converse is not necessarily true. Not every unprofitable lead need be or should be reported in an affidavit. Adopting a practice of including such dead ends in affidavits would only serve to add distracting clutter and needlessly bog down those who must make probable cause determinations. Obviously, the fact that a 1979 criminal investigation that took place near the Quincy Market did not involve the 1986 suspects provides little insight into whether criminal activity is ongoing in 1986.

**15.** Plaintiff's Opposition at 9 (citing Betts Deposition at 33).

was neither a member of the Gambling and Morals Division of the police department nor involved in an official capacity with any ongoing investigations of either the Market or the individual targets of the investigation, warrants little weight.[16]  In short, the omitted Betts statements "were of only peripheral relevancy to the showing of probable cause and ... did not go to the integrity of the affidavit." *Rugendorf v. United States*, 376 U.S. 528, 531–32, 84 S.Ct. 825, 827, 11 L.Ed.2d 887 (1964). Therefore, even if Betts' statements had been included, there remained sufficient reliable information in the affidavit to support a finding of probable cause.[17]  I hold as a matter of law that the Betts statements were not material to the finding of probable cause.

■  Even if the Betts statements were material and should have been included in the affidavit, plaintiff must prove that their omission was the product "of deliberate falsehood or of reckless disregard for the truth." *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684; *United States v. House, supra*, 604 F.2d at 1141 (analogizing *Franks* standard for material misstatements to omissions).  The burden is squarely on plaintiff to come forward with an offer of proof that the omissions were made intentionally or with a reckless disregard for the accuracy of the affidavit; allegations of negligence are insufficient. *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684.

Of course, it will often be difficult for a plaintiff to prove that an omission was made intentionally or with reckless disregard "unless he has somehow gained independent evidence that the affiant had acted from bad motive or recklessly in conducting his investigation and making the affidavit." *United States v. Thompson*, 615 F.2d 318, 329 (5th Cir.1980).  *Franks*, however, nevertheless requires an individual challenging an affidavit to make a showing that an omission was more than a negligent act.  *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684.  *Thompson*, 615 F.2d at 329.  The mere difficulty of the task does not excuse failure to satisfy the prevailing legal standard.  Because plaintiff has failed to furnish "[a]ffidavits or sworn or otherwise reliable statements" establishing reckless disregard or intentionality, and has not satisfactorily explained their absence, he has failed to carry his evidentiary burden. *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684.

Finally, at least one court has indicated that:

> It is possible when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself.

*Thompson*, 615 F.2d at 329.  This possibility, however, is foreclosed to this plaintiff because the statements omitted simply do not permit such an inference to be drawn.  As discussed above, they are neither critical nor material to making a probable cause determination.  The omitted statements were peripheral to the criminal investigation—if they were relevant at all.

---

**16.**  Plaintiff further contends that because Betts was a fairly frequent visitor to the Market and had relied on Washington as a volunteer informant in the past, he had ample opportunity to reach an informed conclusion that no criminal activity was taking place.  He argues that the defendant officers either were reckless in disregarding his views or intentionally concealed the information Betts provided.

Betts' close personal association with Washington and the Market, however, is a two edged sword.  On the one hand, it may have provided him with a vantage point from which to carefully observe the Market and may have given him unique access to the activities taking place inside the Market.  On the other hand, it very well could have formed a reasonable basis for the defendant officers to discount the information he provided on the grounds that he may have been lacking in objectivity.  Aside from his status as a fellow police officer, it is unclear why Betts' opinion—which was plainly one given in his "personal capacity"—should be accorded any greater weight than would be accorded the opinions of other friends and associates of Washington.

**17.**  *See e.g. United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir.1985) (ultimate inquiry on motion to suppress is not whether affidavit contains false allegations or material omissions, but whether after putting such aside, there remains a residue of independent and lawful information sufficient to support probable cause); *United States v. Malsom*, 779 F.2d 1228 (7th Cir. 1985) (accord); *United States v. Marin–Buitrago*, 734 F.2d 889, 895 (2d Cir.1984) (accord).

They were neither inculpatory nor exculpatory in nature. The statements themselves, therefore, for the same reasons why they are not material, *see supra,* cannot give rise to an inference that their omission was either reckless or intentional. See *Ogden v. District of Columbia,* 676 F.Supp. 324 (D.D.C.1987); *see generally Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

### 2. The Informant

■ Plaintiff also challenges the validity of the search warrant because he claims defendants' "reliable informant" either did not exist or was not reliable. Initially, plaintiff sought to obtain the identity of the Confidential Source through discovery.[18] Defendants properly resisted that inquiry. The identity of a Confidential Source is generally privileged. *See McCray v. Illinois,* 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed. 2d 62 (1967).[19] In this case, plaintiff has failed to make a showing of any special factors which would favor violating the privilege and disclosing the Confidential Source's identity.[20]

Despite *McCray,* plaintiff persistently requested to obtain discovery as to the Confidential Source, and repeatedly made allegations that the Confidential Source, in fact, did not exist. As a result of these claims, this court stated that it would conduct an *in camera* hearing to make sure the informant indeed existed and to determine his reliability. In so doing, the court sought both to protect plaintiff's rights and to preserve the anonymity of the Confidential Source.[21]

Plaintiff, contrary to his earlier acquiescence in this process, now informs the court that he strongly objects to the court's meeting with the Confidential Source outside the presence of his counsel. Relying on *Fludd v. United States Secret Service,* 771 F.2d 549 (D.C.Cir.1985), plaintiff contends that such an *in camera* hearing is not appropriate. He now argues that leaving aside the disputed existence and reliability of the Confidential Source, there are material facts in dispute which preclude granting defendants' motion for summary judgment.[22] He therefore argues that *Fludd* bars such a hearing and reserves resolution of such matters to a trial on the merits. Plaintiff's reliance on *Fludd* is misplaced. In this case, plaintiff has put no material facts in dispute to prevent defendants from prevailing on their motion

---

**18.** Plaintiff also sought to obtain a list of all prior criminal arrests and convictions in which the Confidential Source participated as well as the procedures used by the Confidential Source to obtain information. In addition, plaintiff asked defendants to provide him with a detailed account of the relationship between the Confidential Source, Paige and himself. *See generally* Memorandum of Points and Authorities in Support of Plaintiff's Motion to Compel Discovery at 5–7.

**19.** The *McCray* Court concluded that the Constitution does not compel the state "to require the disclosure of the informer's identity in every such preliminary hearing where it appears that the officers made the arrest or search in reliance upon facts supplied by an informer they had reason to trust." 386 U.S. at 312, 87 S.Ct. at 1063. Many appellate courts, however, have gone further and asserted that disclosure of the identity of an informant relied upon to find probable cause is not required. *See* LaFave, *Search and Seizure* § 3.3(g), n. 373 (collecting cases).

**20.** *See Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 627–28, 1 L.Ed.2d 639 (1953) (trial judge must exercise discretion in light of particular circumstances in resolving conflict between privilege of nondisclosure and need to legitimate a search). Compare *McCray, supra* (holding identity of informer need not be disclosed even when information provided by informer was basis for probable cause for warrantless arrest).

**21.** An *in camera* hearing is often the only means available to both obtain useful, material information and protect the public interest in effective law enforcement. *See generally People v. Darden,* 34 N.Y.2d 177, 356 N.Y.S.2d 582, 313 N.E.2d 49 (1974).

The proposed *in camera* hearing, pursuant to the concerns of both counsel, would have taken place without the presence of either plaintiff's or defendants' counsel.

**22.** *See generally* Plaintiff's Motion for Reconsideration and Memorandum of Points and Authorities at 3–6 (*in camera* hearing "inappropriate for the decision on the informant's reliability ...") ("defendants are not entitled to rehabilitate the alleged reliability of their paid informant") ("proposed hearing far exceeds the parameters applicable for consideration of summary judgment").

for summary judgement. An *in camera* hearing, therefore, at least from plaintiff's perspective, would have been appropriate.[23]

Because of plaintiff's strident opposition, this court has decided not to hold any hearing. Plaintiff is in no position now to revive his argument that the informant either does not exist or is lacking in reliability. This argument is without any factual basis, legal merit or equitable appeal.

## B. The Arrest and Search of Washington

■ Defendants' qualified immunity defense to any liability for the arrest of plaintiff and the search of plaintiff's person squarely raises the issue of whether police officers, acting in the utmost good faith, should be required to stand trial and be held liable for civil damages where their conduct may have transgressed an individual's right to be safe from unwarranted searches and seizures. That issue involves construing the scope and parameters of these officers' qualified immunity.[24]

The test of whether a police officer should be held liable in damages cannot rest solely on the determination of whether he was right or wrong in making an arrest or conducting a search. Rather, a stiffer substantive standard must be imposed on individuals seeking money damages than that which is employed in the context of a suppression hearing. That is the unmistakeable import of the Supreme Court's most recent ruling on the doctrine of qualified immunity as applied in the area of law enforcement. *See generally Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987).[25]

In *Anderson,* the Supreme Court applied the "objective" qualified immunity standard first developed in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed. 2d 396 (1982), in the context of an alleged violation of fourth amendment rights by a law enforcement officer. The *Anderson* court made it clear that when applying the qualified immunity standard established by *Harlow* in the context of an alleged fourth amendment violation of "clearly established" law, courts must focus on the reasonableness of the defendants' actions:

> We have recognized that it is inevitable that law enforcement officers will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that *in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—would not be held personally liable.*

*Anderson,* 107 S.Ct. at 3039 (citation omitted) (emphasis added);[26] *see also Malley v.*

---

**23.** In fact, in light of plaintiff's failure to come forth with any evidence challenging defendants' good faith, it seems that such a hearing offered the only realistic possibility for plaintiff to avoid summary judgment. Such *in camera* hearings have been used frequently by courts in the criminal context and have been viewed favorably by most commentators as an effective means of guarding against police perjury and protecting the identity of the informant. *See e.g. United States v. Manley,* 632 F.2d 978 (2d Cir.1980); *United States v. House,* 604 F.2d 1135, 1140 (8th Cir.1979) (collecting cases); *United States v. Weir,* 575 F.2d 668 (8th Cir.1978); *United States v. Doe,* 525 F.2d 878 (5th Cir.1976) (trial judge interviewed informant in chambers); *United States v. Hurse,* 453 F.2d 128, 130–31 (8th Cir.1972) ("it would appear that the courts would have the inherent power to hold an *in camera* proceeding where the circumstance warrants so that both the informer witness and the public policy in favor of effective law enforcement may be observed while still making a judicial determination of the need for disclosure where essential to a fair trial"). La-

Fave, *supra,* § 3.3(g) at n. 401–402 (collecting cases and other authority).

**24.** Plaintiff has not contested the defendant officers' right to claim qualified immunity for their actions. *See Pierson v. Ray,* 386 U.S. 547, 555–57, 87 S.Ct. 1213, 1218–19, 18 L.Ed.2d 288 (1967).

**25.** *See also Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

**26.** In establishing this standard, the Court acknowledged that "[w]hen government officials abuse their offices, 'actions for damages may offer the only realistic avenue for vindication of constitutional guarantees,'" *Anderson,* 107 S.Ct. at 3038 (1987) (quoting *Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736). The Court also recognized, however, that "permitting damage suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will truly inhibit officials in the discharge of their duties." In an effort to accommodate

*Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) ("all but the plainly incompetent or those who knowingly violate the law" are protected by qualified immunity); *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (officials entitled to immunity unless "the law clearly proscribed the actions they took").

The *Anderson* standard strikes a balance between the need to encourage respect for legal rights and the danger that an oppressive threat of civil damages will rob government officials of their initiative. *See Anderson,* 107 S.Ct. at 3037–40. It reflects the fact that, in addition to vulnerability to civil damages, there are other powerful disincentives against illegal police conduct—the most significant obviously being the possibility of suppression of evidence in criminal prosecutions.

The *Anderson* Court also re-emphasized "that qualified immunity questions should be resolved at the earliest possible stage of a litigation." *Anderson,* 107 S.Ct. at 3042, n. 6; *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815–16. The prime rationale of the *Harlow* shift from a "subjective" to an "objective" standard, after all, is to promptly terminate vexatious litigation against public officials. *See generally Harlow,* 457 U.S. at 815–816, 102 S.Ct. at 2737 (subjective element of good-faith defense frequently incompatible with preventing insubstantial claims from proceeding to trial).[27]

The test in this case, therefore, is whether a reasonably competent police officer reasonably could have believed he or she had probable cause to arrest and search plaintiff Washington.[28]

■ The court believes that the undisputed facts in this case clearly show that the defendant police officers acted reasonably and responsibly. There is not a scintilla of evidence that they acted in anything but good faith. They obtained a valid search warrant after a careful and thorough investigation of plaintiff and his Market. The defendant police officers possessed far more than "mere suspicion" that plaintiff Washington was involved in an illegal gambling operation when they entered the Quincy Market.

What is more, the defendant officers' search of the Market uncovered important evidence: a green ledger book containing lottery notations. According to plaintiff, although the book did contain lottery notations, it was in fact a credit extension book used in the Market's daily business operations.[29] Plaintiff contends that if the police officers had listened to and credited his explanation of the so-called incriminating evidence, they would not have arrested him. In support of his position, plaintiff cites the fact that the criminal charges against him by the defendant officers were later dropped. However, a police officer is not required, nor would it be prudent, to hold an evidentiary hearing at the point of an arrest. Therefore, even though plain-

these conflicting concerns, government officials performing discretionary functions have generally been provided with qualified immunity. They are shielded from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.*

27. The *Anderson* Court, seeking to protect public officials from the costs of trial, (and the burdens of discovery), explicitly rejected the dissent's contention that permitting public officials to "raise a defense of reasonable good faith, which apparently could be asserted and proven only at trial" would accord sufficient protection to public officials accused of violating the Fourth Amendment. *Anderson,* 107 S.Ct. at 3039, n. 2. According to the Court, such an approach "would totally abandon the concern—

which was the driving force behind *Harlow*'s substantial reformulation of qualified immunity principles—that 'insubstantial claims' against government officials be resolved prior to discovery and on summary judgment if possible." *Id.*

28. *See Malley v. Briggs,* 106 S.Ct. 1092, 1096, (immunity is lost "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be granted").

29. *See generally* Plaintiff's Opposition at 3 (explaining that the ledger book reflected sums that plaintiff had paid for the purchase of Lotto tickets for a customer).

tiff's explanation may very well have some validity now, under the circumstances prevailing then, the defendant officers were justified in rejecting it.

■ Their belief that the green ledger book was incriminating, combined with the information they possessed prior to the search, gave the defendant officers a reasonable basis to believe they had probable cause to believe that Washington was involved in illicit activity—namely illegal gambling—and therefore to search and arrest plaintiff Washington.[30] Furthermore, the underlying facts in this case—*i.e.,* that a search warrant was obtained, that the defendant officers knocked and explained their purpose before entering the Market, that there was no violence whatsoever and that the record is devoid of any evidence of bad faith on the part of the defendant officers—support the officers' claim of reasonableness and care in making the probable cause determination. Such facts are generally not the stuff of which a section 1983 claim is made. Compare, *Anderson,* 107 S.Ct. 3052–53, n. 21 (Stevens, J., dissenting) (recounting officers' search of Creightons' home).

Plaintiff makes much of the fact that the defendant officers "for whatever reason, saw fit to seek a search warrant for Mr. Washington's store, but not him." Because Washington was not named in the search warrant, plaintiff argues, the officers did not have probable cause to search his person or arrest him. Plaintiff, however, ignores the highly salient discovery of the green ledger book with the lottery notations. Whether or not the officers lacked probable cause to search or arrest Washington when they entered the store, the green ledger book gave them a solid basis to arrest and search plaintiff Washington.

The principal case upon which plaintiff relies to support his claim that the defendants lacked probable cause to arrest and search him is *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979). In that case, the police obtained a search warrant to search a bar based on an informant's tip that he had seen the bartender ("Greg") in possession of heroin. The eight officers who searched the bar systematically frisked all the customers present and found heroin on Ybarra. The Court rejected the government's contention that such a search could be justified by reasonable suspicion or probable cause. Relying on *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court also refused to accept the searching officers' concern for their safety as a basis to frisk everyone present unless they possessed a reasonable belief that a person "was armed and presently dangerous."

*Ybarra,* however, is inapposite. Unlike Ybarra, plaintiff Washington was not innocuously present at the scene of a search. To the contrary, Washington was one of two prime suspects in the defendant officers' criminal investigation. He was closely connected to the premises—in fact he was the owner of the Market. Moreover, he was named repeatedly in the affidavit of probable cause upon which the search warrant was issued. In addition, he admitted ownership of the green ledger book with the lottery notations. It was therefore reasonable for the defendant officers to conclude they had probable cause to believe that the objects named in the search warrant were on the person of Washington.[31] They also had reason to believe that they had probable cause to arrest Washington

---

30. Additional support for the defendants' conclusion that they had probable cause to arrest plaintiff Washington is found in D.C.Code 1981 § 1501, which makes the operation of an illegal lottery a felony. That code section permits probable cause to be presumed from the possession of lottery notations and records. *See supra,* n. 8.

31. *See* D.C.Code § 23–524(g) (1981), which provides in relevant part:

An officer executing a warrant directing a search of premises or a vehicle may search any person therein (1) to the extent necessary to protect himself or others from the use of any weapon which may be concealed upon the person, or (2) to the extent reasonably necessary to find property enumerated in the warrant which may be concealed upon the person.

for a felony crime—*see supra*—and of course could then search him incident to that arrest. *See generally United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).[32] Such individualized suspicion, so powerful in this case, was completely absent in *Ybarra.*

It is obvious that police officers are often confronted with difficult decisions in exercising their search and arrest powers.[33] They at times have a right to be wrong and are not to be held liable for money damages in every instance where either a prosecuting attorney decides not to proceed with a case or a jury acquits the suspect. As long as the presence of probable cause has a reasonable factual basis—as was surely the case here—then the defendants are entitled to immunity. If that were not the case, and these defendant officers were forced to make daily judgment calls about the existence of probable cause without any margin for error, the ultimate result

would be detrimental to society's need for proper police protection.[34] Thus, for the citizens' protection, police officers, acting in good faith and in an objectively reasonable fashion, must be free from vexatious lawsuits.

### C. The Section 1983 Claim Against the District of Columbia

■ Plaintiff also alleges a section 1983 claim against the District of Columbia for negligent supervision or training. This claim is based on two separate grounds. First, plaintiff claims the District of Columbia is legally liable for its alleged failure to properly supervise the execution of search warrants.[35] Second, plaintiff claims the District of Columbia is legally responsible under section 1983 for the alleged injuries he sustained from being handcuffed.[36]

This court's resolution of the section 1983 claims of improper search and arrest against the individual defendants forecloses the first basis for finding the Dis-

---

**32.** Of course, it is axiomatic that the evidence discovered by a search incident to an arrest may not be relied upon to justify the arrest. *See Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ("a search incident to a lawful arrest may not precede the arrest and serve as part of its justification"). It is for that reason that the court has set to one side the evidence found in Washington's pockets as a basis for finding probable cause.

**33.** The Supreme Court has recently observed that its "many cases on the point amply demonstrate the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment." *See Anderson,* 107 S.Ct. at 3041 (citing *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096). *See generally Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329 (1983), ("probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of rules"). The probable cause requirement is designed to "give fair leeway for enforcing the law in the community's protection." *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Courts have frequently cited the *Brinegar* Court's formulation of what information constitutes probable cause to arrest:

Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy

information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed [by the person to be arrested]. 338 U.S. 160, 175–76, 69 S.Ct. at 1310–11 (1949) (quoting *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

**34.** Of course, the Supreme Court has emphasized that "an officer who knows that objectively unreasonable decisions will be actionable may be motivated to reflect, before submitting a request for a warrant, whether he has a reasonable basis for believing that his affidavit establishes probable cause." *Malley,* 106 S.Ct. at 1097. Such reflection is no doubt desirable. *Id.* By the same token, however, once having reflected, police officers must be free to act without nagging fear that they may be haled into court if they make a good faith mistake.

**35.** Plaintiff's Opposition at 16.

**36.** Plaintiff concedes that he cannot establish municipal liability against the District of Columbia pursuant to section 1983 under a theory of respondeat superior. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 818, 105 S.Ct. 2427, 2433–34, 85 L.Ed.2d 791 (1985) (plurality opinion); *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Carter v. District of Columbia,* 795 F.2d 116, 122 (D.C.Cir.1986). Rather, the District of Columbia only can be held accountable directly.

trict of Columbia liable under section 1983. The conduct of the individual defendants does not permit any inference of improper supervision or training. In addition, despite making general allegations of "deliberate indifference," plaintiff has failed to proffer any evidence that the District of Columbia's customary search warrant procedures or training methods are deficient in any way. There is certainly no basis to find that they constitute a custom or policy that causes the deprivation of rights guaranteed under the Constitution. *See generally Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed. 2d 611 (1974) (to make out section 1983 claim, plaintiff must show custom or policy of deprivations on part of government); *City of St. Louis v. Praprotnik,* —— U.S. ——, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (accord).[37] Plaintiff's first basis for a section 1983 claim against the District of Columbia therefore is without merit.

■ Plaintiff's second basis for municipal liability is based on his claim that the defendants placed the handcuffs on him in a negligent manner—that is, too tightly—and that subsequently, they "displayed deliberate indifference to plaintiff's physical pain." Even if plaintiff's allegations are true, and they are hotly contested,[38] they fail to make out a viable section 1983 claim against the District of Columbia. For the same reasons that his negligent supervision theory fails regarding the execution of the warrant, it fails regarding the application of the handcuffs. There is no evidence that the allegedly improper handcuffing of

plaintiff was the product of a pattern of similar incidents or that the District of Columbia fails to properly train its officers in this regard.[39] Because plaintiff has failed to show that the alleged handcuff problem involves anything more than an "action taken unilaterally by a nonpolicymaking municipal employee," *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 2439 (concurring opinion), and has not established "an affirmative link between the [District of Columbia's] policy and the particular constitutional violation alleged," *Id.* at 2436 & n. 8, his section 1983 claim is inadequate to establish municipal liability.

## II. Plaintiff's Common Law Claims

■ Plaintiff also has stated common law claims of assault and battery, false arrest/false imprisonment, malicious prosecution and negligence against the individual defendants. He has also made the same claims vicariously against the District of Columbia under the theory of respondeat superior. For the same reasons these defendant officers are immune from a section 1983 lawsuit, they should be impervious to the state law claims based on the same operative set of facts. However, in deference to principles of comity, and in light of my disposition of the federal, section 1983 claims, I decline to exercise jurisdiction over plaintiff's common law claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("[c]ertainly, if the federal claims are dismissed before trial, even

37. *See also Haynesworth v. Miller,* 820 F.2d 1245, 1264 (D.C.Cir.1987) (accord); *Carter v. District of Columbia,* 795 F.2d 116, 122 (D.C.Cir. 1986) ("city is answerable under *Monell* when an official policy or custom causes the complainant to suffer a deprivation of a constitutional right").

38. Plaintiff concedes that one of the defendant officers did in fact respond to his request that his handcuffs be loosened—but that the adjustment actually worked to make them "tighter than before." *See* Interrogatory Answer 30. Plaintiff does not allege, nor does he offer any proof that the handcuffs were either put on too tight or subsequently made too tight intentionally—or that the defendant officers intended to physically harm him.

39. In fact, even if the defendants' allegedly improper handcuffing had been intended to harm plaintiff, it would not suffice to establish municipal liability. *See generally Martin v. Malhoyt,* 830 F.2d 237, 255 (D.C.Cir.1987) ("One instance, no matter how egregious, does not a pattern or practice make."); *Carter v. District of Columbia,* 795 F.2d 116, 122 (D.C.Cir.1986) ("To hold a municipality accountable, the plaintiff must establish that the official policy or custom itself is 'the moving force of the constitutional violation.'") (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. at 2038); *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981) (accord).

though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well"). *Haynesworth v. Miller,* 820 F.2d 1245, 1248, n. 1 (D.C.Cir.1987) (accord).

*Conclusion*

For the foregoing reasons, plaintiff's section 1983 claims against all defendants are dismissed with prejudice. His common law claims are dismissed in the discretion of this court pursuant to *Gibbs.*